No. 22-1463

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

————————————

SHANNON MARTIN, M.D., Relator, ex rel. UNITED STATES OF AMERICA;
DOUGLAS MARTIN, Relator, ex rel. UNITED STATES OF AMERICA,

Plaintiffs-Appellants,

v.

DARREN HATHAWAY, M.D.; SOUTH MICHIGAN OPHTHALMOLOGY; and
ELLA E. M. BROWN CHARITABLE CIRCLE, dba Oaklawn Hospital,

Defendants-Appellees.

————————————

On Appeal from the United States District Court
for the Western District of Michigan

————————————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF APPELLANTS**

————————————

<div style="margin-left:40%">

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

MARK A. TOTTEN
*United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
DANIEL WINIK
*Attorneys, Appellate Staff
Civil Division, Room 7245
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 305-8849*

</div>

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ii

INTEREST OF THE UNITED STATES .......................................................1

STATEMENT OF THE CASE .........................................................................3

      A.     Statutory Background ...................................................................3

      B.     This Litigation .................................................................................5

SUMMARY OF ARGUMENT .........................................................................9

ARGUMENT ..................................................................................................... 10

I.     THE COMPLAINT ALLEGES REMUNERATION WITHIN THE MEANING OF THE AKS .................................................................................................... 10

II.    THE COMPLAINT ALLEGES A SUFFICIENT CAUSAL NEXUS BETWEEN AKS VIOLATIONS AND THE SUBMISSION OF FALSE CLAIMS ....................................... 14

CONCLUSION ................................................................................................... 25

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                                         **Page(s)**

*Burrage v. United States*,
    571 U.S. 204 (2014) ................................................................ 21, 22

*Hanlester Network v. Shalala*,
    51 F.3d 1390 (9th Cir. 1995) ................................................................ 11

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Association*,
    141 S. Ct. 2172 (2021) ................................................................ 10

*Jones-McNamara v. Holzer Health Systems*,
    630 F. App'x 394 (6th Cir. 2015) ................................................................ 12

*Kuzma v. Northern Arizona Healthcare Corp.*,
    2022 WL 2159027 (D. Ariz. June 15, 2022) ................................................................ 19

*McNutt ex rel. United States v. Haleyville Medical Supplies, Inc.*,
    423 F.3d 1256 (11th Cir. 2005) ................................................................ 4, 15

*Miller v. Abbott Laboratories*,
    648 F. App'x 555 (6th Cir. 2016) ................................................................ 12

*Paroline v. United States*,
    572 U.S. 434 (2014) ................................................................ 21, 23

*Pfizer, Inc. v. HHS*,
    42 F.4th 67 (2d Cir. 2022) ................................................................ 10, 12

*United States v. Bay State Ambulance & Hospital Rental Service, Inc.*,
    874 F.2d 20 (1st Cir. 1989) ................................................................ 11, 12

*United States v. Greber*,
    760 F.2d 68 (3d Cir. 1985) ................................................................ 11

*United States v. Medtronic, Inc.*,
    2021 WL 4168140 (D. Kan. Sept. 14, 2021) ................................................................ 19

*United States v. Patel,*
  778 F.3d 607 (7th Cir. 2015) ............................................................ 3, 4, 14

*United States v. Rogan,*
  517 F.3d 449 (7th Cir. 2008) ............................................................ 14, 15

*United States v. SouthEast Eye Specialists, PLLC,*
  570 F. Supp. 3d 561 (M.D. Tenn. 2021) .......................................... 12

*United States v. Teva Pharmaceuticals USA, Inc.,*
  2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019) .................................. 19

*United States ex rel. Banigan v. PharMerica, Inc.,*
  950 F.3d 134 (1st Cir. 2020) ............................................................ 11

*United States ex rel. Bawduniak v. Biogen Idec, Inc.,*
  2018 WL 1996829 (D. Mass. Apr. 27, 2018) .................................. 19

*United States ex rel. Brown v. Celgene Corp.,*
  2014 WL 3605896 (C.D. Cal. July 10, 2014) .................................. 15

*United States ex rel. Cairns v. D.S. Medical LLC,*
  42 F.4th 828 (8th Cir. 2022) ............................................................ 20

*United States ex rel. Everest Principals, LLC v. Abbott Laboratories, Inc.,*
  2022 WL 3567063 (S.D. Cal. Aug. 18, 2022) ................................ 20

*United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.,*
  2021 WL 101193 (D. Minn. Jan. 12, 2021) .................................... 19

*United States ex rel. Fitzer v. Allergan, Inc.,*
  2022 WL 3599139 (D. Md. Aug. 23, 2022) ................................ 19, 21, 22

*United States ex rel. Fry v. Health Alliance of Greater Cincinnati,*
  2008 WL 5282139 (S.D. Ohio Dec. 18, 2008) ................................ 11

*United States ex rel. Greenfield v. Medco Health Solutions, Inc.,*
  880 F.3d 89 (3d Cir. 2018) ..................................................8, 18, 19, 22

*United States ex rel. Hutcheson v. Blackstone Medical, Inc.,*
  647 F.3d 377 (1st Cir. 2011) ............................................................ 4

*United States ex rel. Kester v. Novartis Pharmaceuticals Corp.,*
    41 F. Supp. 3d 323 (S.D.N.Y. 2014) ................................................. 5, 19

*United States ex rel. Parikh v. Citizens Medical Center,*
    977 F. Supp. 2d 654 (S.D. Tex. 2013) ................................................. 14, 21

*United States ex rel. Rembert v. Bozeman Health Deaconess Hospital,*
    2017 WL 514205 (D. Mont. Feb. 7, 2017) ................................................. 11

*United States ex rel. Thomas v. Bailey,*
    2008 WL 4853630 (E.D. Ark. Nov. 6, 2008) ................................................. 5

*United States ex rel. Westmoreland v. Amgen, Inc.,*
    812 F. Supp. 2d 39 (D. Mass. 2011) ................................................. 4

*United States ex rel. Wilkins v. United Health Group, Inc.,*
    659 F.3d 295 (3d Cir. 2011) ................................................. 1, 4, 14, 15

*Universal Health Services, Inc. v. United States,*
    579 U.S. 176 (2016) ................................................. 4

**Statutes:**

Social Security Amendments of 1972, Pub. L. No. 92-603, tit. II,
    § 242(b), (c), 86 Stat. 1329 ................................................. 10

Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub. L. No. 95-142,
    § 4(a), 91 Stat. 1175 (1977) ................................................. 11

31 U.S.C. § 3729(a)(1)(A) ................................................. 3

31 U.S.C. § 3729(a)(1)(B) ................................................. 4

31 U.S.C. § 3730(a) ................................................. 3

31 U.S.C. § 3730(b)(1) ................................................. 3

42 U.S.C. § 1320a-7a(a)(5) ................................................. 12

42 U.S.C. § 1320a-7a(a)(7) ................................................. 3

42 U.S.C. § 1320a-7a(i)(6) ................................................................. 9, 12

42 U.S.C. § 1320a-7b(b)(1) ....................... 2, 3, 9, 16, 19, 21, 22, 24

42 U.S.C. § 1320a-7b(b)(2) ....................... 2, 3, 9, 15, 16, 19, 21, 22

42 U.S.C. § 1320a-7b(g) ............................... 1, 5, 9, 15, 17, 18

**Regulation:**

42 C.F.R. § 1001.952(s) ............................................................13

**Legislative Materials:**

155 Cong. Rec. S10,853-854 (daily ed. Oct. 28, 2009) ................................ 5, 22

**Other Authorities:**

*Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions*, 56 Fed. Reg. 35,952 (July 29, 1991) ...............................................11

*Medicare and State Health Care Programs: Fraud and Abuse; Clarification of the Initial OIG Safe Harbor Provisions and Establishment of Additional Safe Harbor Provisions Under the Anti-Kickback Statute*, 64 Fed. Reg. 63,518 (Nov. 19, 1999) ................................. 13, 14

## INTEREST OF THE UNITED STATES

The Anti-Kickback Statute (AKS) plays an essential role in ensuring the integrity of medical care by establishing that the government will pay only for items and services from providers who lack potential financial conflicts.  Courts have long held that claims seeking reimbursement for items or services for which a kickback was offered or solicited are false or fraudulent under the False Claims Act (FCA), because "'[t]he Government does not get what it bargained for when a defendant is paid … for services tainted by a kickback.'"  *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 314 (3d Cir. 2011), *abrogated on other grounds by Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016).  And in 2010, Congress amended the AKS to state expressly that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of" the FCA.  42 U.S.C. § 1320a-7b(g).  FCA actions based on AKS violations are a crucial means by which the restrictions set forth in the AKS are enforced.

The district court's decision undermines, in two ways, this essential mechanism for ensuring conflict-free medical care to beneficiaries of federal health care programs.  *First*, the decision reflects an incorrect understanding of what the AKS means by "remuneration."  The complaint alleges a scheme in which a physician agreed that his practice would conduct surgical procedures at a particular hospital in exchange for the hospital's agreement not to establish a competing ophthalmology practice that would have halted the referral of hospital patients to that physician.  The hospital's ability to bill for

procedures referred by the physician and his practice, and the physician's and his practice's ability to bill for patients referred by the hospital, carried significant value and constitute "remuneration." So did the benefit that the physician and his practice realized when the hospital declined to launch an in-house ophthalmology service line.

*Second*, the decision appears to apply an improperly heightened standard for the "causal connections" that a relator must show between allegedly false claims and an alleged "scheme" to violate the AKS. Opinion and Order, RE108, PageID #1653. Remuneration can support AKS liability when it is solicited or received "in return for," or offered or paid "to induce," referrals or the provision of items or services. 42 U.S.C. § 1320a-7b(b)(1), (2). The complaint, taken as true on a motion to dismiss, alleges that after defendants gave each other remuneration "to induce" referrals, and received that remuneration "in return for" referrals, the referrals that were the focus of the remuneration in fact happened: The hospital continued to refer patients for ophthalmological care by the physician and his practice, instead of establishing its own service line, and the physician and his practice continued to refer surgical procedures to the hospital. That is sufficient for items or services provided in the course of those referrals to "result[] from" the AKS violation for purposes of § 1320a-7b(g), and thus for claims seeking reimbursement for those items or services to be false or fraudulent under the FCA. No further connection is required.

The United States has a strong interest in preserving the vitality of the FCA as a mechanism for ensuring that federal health care programs do not pay for items and

services that were the subject of illegal kickbacks. The district court's ruling imperils that interest and should be reversed.

## STATEMENT OF THE CASE

### A.    Statutory Background

1.    The FCA imposes liability on, among others, anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). FCA actions may be brought by the Attorney General or by a private *qui tam* relator in the name of the United States. *Id.* § 3730(a), (b)(1).

2.    The AKS imposes criminal liability on any person who (1) "knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) … in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program"; or (2) "knowingly and willfully offers or pays any remuneration … to any person to induce such person … to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1), (2). A related provision authorizes civil enforcement actions seeking monetary penalties, treble damages, and exclusion from participation in federal health care programs. *Id.* § 1320a-7a(a)(7).

3.    The AKS protects patients "from doctors whose medical judgments *might* be clouded by improper financial considerations," *United States v. Patel*, 778 F.3d 607, 612

(7th Cir. 2015) (emphasis added), in recognition of the fact that it may sometimes be difficult to ascertain what judgments a provider would have made in the absence of the kickback. Courts have therefore recognized that "'[t]he Government does not get what it bargained for when a defendant is paid by [Medicare or Medicaid] for services tainted by a kickback,'" whether or not it can show that a conflict-free provider would have given the same care. *Wilkins*, 659 F.3d at 314. And as a result, AKS violations often lead to FCA liability. *See, e.g.*, *id.* at 313; *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 392-394 (1st Cir. 2011); *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005).

Such liability can be established in multiple ways. Where a provider expressly but falsely certifies in requesting payment that it has complied with the AKS, that certification is actionable as a "false record or statement" material to the provider's claim. 31 U.S.C. § 3729(a)(1)(B). Even without an express certification, a provider can be liable under the FCA if it "makes specific representations about the goods or services provided" but "fail[s] to disclose noncompliance with material statutory, regulatory, or contractual requirements" in a way that "makes those representations misleading half-truths." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 190 (2016); *see, e.g.*, *United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 54 (D. Mass. 2011) ("[C]ourts, without exception, agree that compliance with the [AKS] is a precondition of Medicare payment, such that liability under the [FCA] can be predicated on a violation of the [AKS].").

In 2010, Congress amended the AKS to add a more direct way of establishing FCA liability for AKS violations. The added provision states that "[i]n addition to" the AKS's criminal penalties and the remedies available under § 1320a-7a, any "claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. § 1320a-7b(g). A sponsor explained that the amendment was meant to "strengthen[] whistleblower actions based on medical care kickbacks" by overruling a then-recent decision—*United States ex rel. Thomas v. Bailey*, 2008 WL 4853630 (E.D. Ark. Nov. 6, 2008)—that had found a hospital's reimbursement claims for surgeries were not false, even though the surgeon had violated the AKS, because the hospital had not itself violated the AKS or been aware of the surgeon's violation. 155 Cong. Rec. S10,853 (daily ed. Oct. 28, 2009) (Sen. Kaufman). The amendment would make clear, the sponsor explained, "that all claims resulting from illegal kickbacks are 'false or fraudulent,' even when the claims are not submitted directly by the wrongdoers themselves." *Id.*; *see* 155 Cong. Rec. S10,854 (Sen. Leahy, making the same point); *see also United States ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 333 (S.D.N.Y. 2014) (discussing this legislative history).

### B.   This Litigation

1.   Relators, Dr. Shannon Martin and her husband, allege the following facts. Dr. Martin was employed by South Michigan Ophthalmology, owned by Dr. Darren Hathaway, in Marshall, Michigan. Second Amended Complaint, RE64, PageID #813-815 ¶¶ 5, 6, 13. Many of South Michigan's patient referrals came from Oaklawn

Hospital, a community hospital in Marshall that lacked an ophthalmology service line. *Id.* PageID #821-822 ¶ 62. South Michigan, in turn, referred many of its surgical patients to Oaklawn (*i.e.*, its physicians performed surgeries at Oaklawn), *id.* PageID #817 ¶ 34, allowing the hospital to bill a fee for those procedures.

In 2018, Dr. Martin accepted a tentative offer from Oaklawn to start an in-house ophthalmology service line, backed by hospital resources. *Id.* PageID #815-816 ¶¶ 19-21. That would have been catastrophic for South Michigan and Dr. Hathaway: They would have lost their major source of patient referrals, as Oaklawn would have been motivated to keep ophthalmology patients in-house. *Id.* PageID #816 ¶ 23, PageID #821-822 ¶ 62. So Dr. Hathaway met with the hospital CEO to discourage him from hiring Dr. Martin. *Id.* PageID #821-822 ¶ 62. The CEO encouraged Dr. Hathaway to talk to the hospital's board of directors, which he did. *Id.* PageID #816-817 ¶¶ 28-29. Dr. Hathaway sent the board a letter stating that he "would be forced" to take his surgical cases elsewhere if the hospital hired Dr. Martin. *Id.* PageID #817 ¶ 34 (emphasis omitted). He made that threat even though he was most comfortable performing challenging procedures at Oaklawn (*id.* PageID #817 ¶ 35).

The threat worked: On October 26, 2018, the board rejected the proposed offer to Dr. Martin. *Id.* PageID #818 ¶¶ 37-45. Afterward, a board member wrote to Dr. Hathaway that she was "[l]ooking forward to increased surgical volume." *Id.* PageID #819 ¶ 47 (emphasis omitted). Dr. Hathaway responded: "It's coming." *Id.* (emphasis

omitted).  Dr. Martin continued working for South Michigan through December 2018. *Id.* PageID #837 ¶ 120.

2.    Dr. Martin and her husband brought this *qui tam* suit under the FCA against Dr. Hathaway, South Michigan, and Oaklawn.  The complaint alleges that the defendants violated the AKS, in that Oaklawn gave South Michigan and Dr. Hathaway a continued stream of referrals, and the benefit of not competing with a hospital-backed ophthalmology practice, in exchange for South Michigan's continued referral of procedures to Oaklawn.  *Id.* PageID #826-829 ¶¶ 75-86.  The complaint accordingly alleges that claims seeking reimbursement for items or services provided by Oaklawn to patients referred from Dr. Hathaway or South Michigan, or provided by Dr. Hathaway or South Michigan at Oaklawn or to patients referred from Oaklawn, were false or fraudulent under the FCA.  *Id.* PageID #829 ¶¶ 87-89; *id.* PageID #846 ¶¶ 151-152.

The complaint identifies 14 "characteristic claims for procedures referred by South Michigan/Dr. Hathaway to Oaklawn on or after October 26, 2018"—when the Oaklawn board rejected Dr. Martin's employment offer—"for which Oaklawn, in fact, received reimbursement from Medicare and/or Medicaid." *Id.* PageID #834-837 ¶ 119. For some of those claims, Dr. Martin was the treating physician; for others, Dr. Hathaway was.  *Id.*  The complaint also identifies eight "characteristic claims for procedures performed by South Michigan/Dr. Hathaway at Oaklawn on or after October 26, 2018 and submitted by South Michigan/Dr. Hathaway to Medicare and Medicaid."  *Id.* PageID #837-839 ¶ 123.  For those claims, Dr. Martin was the treating physician.  *Id.*

3.     The district court dismissed the complaint.  Opinion and Order, RE108, PageID #1642-1659.  It held that relators' FCA claim "does not state a plausible kickback scheme" because relators "have not alleged how the scheme afforded the hospital any new competitive benefit, i.e., a 'kickback.'"  *Id.* PageID #1652-1653.  The court further held that relators "have not alleged plausible causal connections between the scheme and the claims they have … identified" as false.  *Id.* PageID #1653.  It opined that claims for services provided to Dr. Martin's patients at Oaklawn could not "be part of an alleged kickback scheme" because Dr. Martin "did not know of the scheme."  *Id.* And it concluded that "claims submitted by Oaklawn for services provided to Dr. Hathaway's patients are also not adequately connected to the purported scheme" because "the FCA only reaches claims that include services 'resulting from' an underlying AKS violation," and "[p]laintiffs allege no facts from which the Court can reasonably infer that the post-October 26 referrals, unlike the pre-October 26 referrals, were caused by or 'result from' the submission of a false claim."  *Id.* PageID #1654.  The court noted that "Rule 9(b) does not permit speculation," and cited *United States ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89 (3d Cir. 2018), for the proposition that "'[i]t is not enough … to show temporal proximity between [an] alleged kickback plot and the submission of claims for reimbursement.'"  Opinion and Order, RE108, PageID #1654 (quoting 880 F.3d at 100).  It concluded by stating that relators "have not supplied any requisite characteristic examples of the purported scheme."  *Id.* PageID #1655.

- 8 -

## SUMMARY OF ARGUMENT

The district court erred in holding that relators failed to allege remuneration within the meaning of the AKS.  The AKS prohibits the solicitation, receipt, offer, or payment of "*any* remuneration (including any kickback, bribe, or rebate)" whether "directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. § 1320a-7b(b)(1), (2) (emphasis added).  Courts have rightly read that language to encompass anything of value in any form, and the complaint here alleges that each defendant gave and received valuable consideration in their cross-referral scheme.  Dr. Hathaway and South Michigan solicited, and the hospital gave them, a continued stream of patient referrals and continued primacy in the local ophthalmology market.  And the hospital, in turn, solicited and received a continued stream of surgical referrals from Dr. Hathaway and South Michigan.  The district court offered no valid ground for its conclusion that the complaint failed to allege remuneration.  Indeed, it cited a definition of remuneration, in 42 U.S.C. § 1320a-7a(i)(6), that is expressly inapplicable here.

The district court also erred in determining that the claims alleged to be false were not sufficiently "connected to" the alleged AKS violations (Opinion and Order, RE108, PageID #1654).  Courts have long held that claims seeking reimbursement for items or services for which an illegal kickback was offered or solicited are false or fraudulent under the FCA, and in 2010, Congress stated expressly that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of" the FCA.  42 U.S.C. § 1320a-7b(g).  Because relators allege that

Dr. Hathaway and South Michigan referred patients to Oaklawn and that Oaklawn continued referring patients to Dr. Hathaway and South Michigan, after giving remuneration to induce such referrals and receiving remuneration in return for them, the complaint pleads the requisite connection between false claims and AKS violations.

## ARGUMENT

### I. THE COMPLAINT ALLEGES REMUNERATION WITHIN THE MEANING OF THE AKS

1.    Section 1320a-7b(b) does not supply a definition of "remuneration." "Where Congress does not furnish a definition of its own," courts "generally seek to afford a statutory term 'its ordinary or natural meaning.'" *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2176 (2021). As the Second Circuit recently explained, "the plain meaning of 'remuneration' is clearly broader than a kickback, bribe, or rebate: 'Remuneration' means '[p]ayment; compensation, esp[ecially] for a service that someone has performed,' and the modifier 'any' further broadens the scope of the phrase." *Pfizer, Inc. v. HHS*, 42 F.4th 67, 75 (2d Cir. 2022).

That broad meaning is confirmed by the history of the statute. When Congress enacted the AKS, the statute did not refer to "remuneration"; it applied only to a "kickback or bribe" or a "rebate of any fee or charge" for the prohibited referral. Social Security Amendments of 1972, Pub. L. No. 92-603, tit. II, § 242(b), (c), 86 Stat. 1329, 1419-1420. Five years later, however, Congress amended the statute to apply to "any remuneration (including any kickback, bribe, or rebate)" that is offered, paid, solicited,

or received "directly or indirectly, overtly or covertly, in cash or in kind." Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub. L. No. 95-142, § 4(a), 91 Stat. 1175, 1180 (1977). Courts have recognized that the amendment "was intended to broaden the reach of the law," *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995), *superseded by statute on other grounds as stated in United States v. Shvets*, 631 F. App'x 91, 96 (3d Cir. 2015); *see United States v. Greber*, 760 F.2d 68, 72 (3d Cir. 1985), and that the term now applies "broadly," *United States ex rel. Banigan v. PharMerica, Inc.*, 950 F.3d 134, 143 (1st Cir. 2020); *see also Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions*, 56 Fed. Reg. 35,952, 35,958 (July 29, 1991) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever.").

The complaint here plainly alleges remuneration within the broad meaning of that term. Relators allege that Dr. Hathaway and South Michigan solicited, and Oak-lawn gave them, a continued stream of patient referrals and the absence of competition from an in-house ophthalmology service line. Those held considerable value. Oaklawn, in turn, solicited and received a continued stream of surgical referrals—also of consid-erable value—from Dr. Hathaway and South Michigan. Courts have regarded "cross-referral scheme[s]," *United States ex rel. Fry v. Health All. of Greater Cincinnati*, 2008 WL 5282139, at *16 (S.D. Ohio Dec. 18, 2008); *see id.* at *6-8, non-compete agreements, *see, e.g.*, *United States ex rel. Rembert v. Bozeman Health Deaconess Hosp.*, 2017 WL 514205 (D. Mont. Feb. 7, 2017), and the "opportunity to earn money," *United States v. Bay State*

*Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29 (1st Cir. 1989); *see United States v. SouthEast Eye Specialists, PLLC*, 570 F. Supp. 3d 561, 576 (M.D. Tenn. 2021), as remuneration violating the AKS.

The district court quoted 42 U.S.C. § 1320a-7a(i)(6) for the proposition that "[t]he AKS defines 'remuneration' as 'transfers of items or services for free or for other than fair market value.'" Opinion and Order, RE108, PageID #1652. But as § 1320a-7a(i) states, that definition applies only "[f]or the purposes of th[e] section" in which it appears—namely § 1320a-7a, which among other things makes it unlawful to "offer[] ... or transfer[] remuneration to any individual eligible for benefits" with the knowledge that doing so "is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service" covered by a public health care program, 42 U.S.C. § 1320a-7a(a)(5). It does not apply to the provision relevant here, § 1320a-7b(b).[1] *See Pfizer*, 42 F.4th at 77-78 (discussing differences between § 1320a-7a and § 1320a-7b).

2.    The district court reached its contrary conclusion in a single sentence, stating without explanation that relators had "not alleged how the scheme afforded the hospital any new competitive benefit, i.e., a 'kickback.'" Opinion and Order, RE108, PageID #1652-1653. But a benefit need not be "competitive" in nature to qualify as

---

[1] This Court has made the same error in some unpublished opinions. *See Miller v. Abbott Labs.*, 648 F. App'x 555, 561 (6th Cir. 2016) (per curiam); *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 400 (6th Cir. 2015).

remuneration. Nor need it be "new" for its continuation to qualify as remuneration. As discussed above, the alleged scheme afforded the hospital a significant benefit: maintaining a referral stream from Dr. Hathaway and South Michigan. And the district court did not consider the benefits afforded to Dr. Hathaway and South Michigan by the alleged scheme—namely, a continued referral stream from the hospital and the benefit of not having to compete with an ophthalmology service line at the hospital.

3.    Before the district court, defendants offered two other arguments that relators had failed to plead remuneration, but those are equally unpersuasive, and the district court did not adopt them.

*First*, defendants argued that the benefit Dr. Hathaway and South Michigan received from the hospital's decision not to hire Dr. Martin "was illusory because Dr. Martin was still free to compete with Dr. Hathaway and did so." Brief in Support of Motion to Dismiss, RE97, PageID #1458. But the harm to Dr. Hathaway would presumably have been worse had the hospital established an in-house service line. That is at least a plausible inference at the pleading stage.

*Second*, defendants argued (*id.*) that their alleged conduct fell within a regulatory safe harbor for referral arrangements for specialty services, 42 C.F.R. § 1001.952(s). But that safe harbor is "limited to … an agreement to refer patients to a specialist in return for an agreement or understanding that the specialist will refer those same patients back at the agreed upon time or circumstance." *Medicare and State Health Care Programs: Fraud and Abuse; Clarification of the Initial OIG Safe Harbor Provisions and Establishment of*

*Additional Safe Harbor Provisions Under the Anti-Kickback Statute*, 64 Fed. Reg. 63,518, 63,548 (Nov. 19, 1999) (emphasis omitted).  No such agreement is at issue here.

## II.  THE COMPLAINT ALLEGES A SUFFICIENT CAUSAL NEXUS BETWEEN AKS VIOLATIONS AND THE SUBMISSION OF FALSE CLAIMS

The district court further erred in holding that relators had "not alleged plausible causal connections between the" alleged "scheme" to violate the AKS "and the claims they … identified" as false.  Opinion and Order, RE108, PageID #1653.

1.     The AKS protects patients "from doctors whose medical judgments *might* be clouded by improper financial considerations."  *Patel*, 778 F.3d at 612 (emphasis added).  Congress's decision to forbid the conflict itself reflects that it can sometimes be difficult to discern why a provider made a particular medical decision.  The AKS accordingly does not require that a kickback be successful or that the services would not have otherwise been provided in order for the kickback to be illegal.  *See, e.g.*, *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013) ("The AKS's plain language … makes it unlawful for a defendant to pay a kickback with the intent to induce a referral, whether or not a particular referral results."), *aff'd sub nom. United States ex rel. Parikh v. Brown*, 587 F. App'x 123 (5th Cir. 2014).  And given Congress's choice to forbid potential conflicts in themselves, it is plain that "'[t]he Government does not get what it bargained for when a defendant is paid by [Medicare or Medicaid] for services tainted by a kickback,'" whether or not a conflict-free provider might have given the same care.  *Wilkins*, 659 F.3d at 314; *see also, e.g.*, *United States v. Rogan*, 517

- 14 -

F.3d 449, 453 (7th Cir. 2008) (Medicare and Medicaid "offer[] a subsidy … with conditions").

That is why Congress has explicitly provided that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of" the FCA.  42 U.S.C. § 1320a-7b(g).  It is also why, even before the enactment of that provision, courts had long "held that non-compliance with the AKS rendered a claim non-payable and that a FCA claim could therefore be premised on an AKS violation." *United States ex rel. Brown v. Celgene Corp.*, 2014 WL 3605896, at *7 (C.D. Cal. July 10, 2014) (citing among others *Wilkins*, 659 F.3d at 313-314, and *McNutt*, 423 F.3d at 1259).  When remuneration is given to induce or received in return for referrals or the provision of items or services, and those intended results of the remuneration come to pass, reimbursement for the items or services (or those provided in the course of the referrals) is definitionally reimbursement the government has not agreed to pay.

2.    The claims here had the requisite nexus to the alleged AKS violations to be false or fraudulent under the FCA.  Relators allege that Oaklawn provided remuneration to Dr. Hathaway and South Michigan "to induce" them to continue referring patients to Oaklawn, and Dr. Hathaway and South Michigan provided remuneration to Oaklawn "to induce" Oaklawn not to create a competing ophthalmology practice and divert referrals from Dr. Hathaway and South Michigan.  Second Amended Complaint, RE64, PageID #826 ¶¶ 75-76; *see* 42 U.S.C. § 1320a-7b(b)(2).  Each defendant's alleged purpose in providing remuneration thus was to cause its counterparty to make referrals

- 15 -

that would benefit the defendant.  Equivalently, Oaklawn received remuneration from Dr. Hathaway and South Michigan "in return for" not creating a competing practice, and Dr. Hathaway and South Michigan received remuneration from Oaklawn "in return for" continuing to refer patients to Oaklawn.  42 U.S.C. § 1320a-7b(b)(1).  After Oaklawn rescinded its offer to Dr. Martin, Oaklawn then submitted claims to Medicare and Medicaid for care provided to patients referred from Dr. Hathaway and South Michigan.  Second Amended Complaint, RE64, PageID #834-837 ¶¶ 87, 119.  And Dr. Hathaway and South Michigan submitted claims to Medicare and Medicaid for care provided at Oaklawn, or to patients referred to them from Oaklawn.  *Id.* PageID #837-839 ¶¶ 88, 89, 123, 151.

The complaint thus alleges a sufficient nexus between AKS violations and claims submitted to Medicare and Medicaid to render those claims false or fraudulent under the FCA.  Relators' brief relies exclusively on § 1320a-7b(g) to contend that the claims at issue are false.  *E.g.*, Br. 61-62.[2]  Their complaint adequately alleges falsity under that provision.  As discussed above, remuneration can support liability under the AKS when it is solicited or received "in return for," or offered or paid with the intent "to induce," the provision of items or services or referrals to provide them.  42 U.S.C. § 1320a-7b(b)(1), (2).  The complaint, taken as true at this stage, alleges that after defendants

---

[2] Relators' complaint also alleged that defendants had "falsely represented compliance with" the AKS.  RE64, PageID #844 ¶ 144.  But relators have not preserved that alternative theory of liability on appeal, and the Court need not address it.

provided remuneration "to induce" referrals, and received that remuneration "in return for" referrals, the referrals in fact happened:  Oaklawn continued to refer patients to Dr. Hathaway and South Michigan, instead of establishing its own service line, and Dr. Hathaway and South Michigan continued to refer surgical procedures to Oaklawn.  That is sufficient for items or services provided in the course of those referrals to "result[] from" the AKS violation, for purposes of § 1320a-7b(g), and thus for claims seeking reimbursement for those items or services to be false or fraudulent under the FCA.

3.    The district court's contrary reasoning lacks merit.

a.    The district court analyzed causation for two groups of claims submitted for services provided at Oaklawn: (1) claims for patients referred by Dr. Hathaway for surgery at Oaklawn and (2) claims for patients referred by Dr. Martin for surgery at Oaklawn.

As to the first group, the court stated that the complaint "allege[d] no facts from which" one could "reasonably infer that the post-October 26 referrals [by Dr. Hathaway to Oaklawn], unlike the pre-October 26 referrals, were caused by or 'result from' the submission of a false claim."  Opinion and Order, RE108, PageID #1654.  (October 26 was when Oaklawn rescinded Dr. Martin's offer.  *See supra* p. 6).  As an initial matter, the court misstated the inquiry.  The relevant question is not whether "referrals … were caused by or 'result from' the submission of a false claim," *id.*, but whether the claims at issue "include[] items or services resulting from a violation of" the AKS, 42 U.S.C. § 1320a-7b(g).

To the extent the court meant to say it could not infer that post-October 26 referrals by Dr. Hathaway resulted from the remuneration he received from Oaklawn, that is equally incorrect. Again, the complaint's key allegations are that (1) Dr. Hathaway threatened that he and South Michigan would stop referring patients to Oaklawn unless Oaklawn rescinded its offer to Dr. Martin; (2) Oaklawn rescinded the offer as a result; and (3) Dr. Hathaway then continued referring patients to Oaklawn. Items and services provided in the course of those procedures "result[] from" the underlying AKS violation, 42 U.S.C. § 1320a-7b(g).

The court cited *United States ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89 (3d Cir. 2018), for the proposition that "'[i]t is not enough … to show temporal proximity between [an] alleged kickback plot and the submission of claims for reimbursement'" (Opinion and Order, RE108, PageID #1654 (quoting 880 F.3d at 100)), but this case is nothing like *Greenfield*. In *Greenfield*, the relator claimed that the defendant pharmacy had paid kickbacks to charities in exchange for their recommending its services, 880 F.3d at 92, but there was no evidence at summary judgment that any of the patients at issue had been exposed to the improper recommendations, *id.* at 99-100. The care of those patients would not have had any causal nexus to the AKS violation unless the patients had been referred by (or had seen the recommendations from) the charities that had received kickbacks, and that evidence was lacking. The Third Circuit accordingly held that mere "temporal proximity between [the] alleged kickback plot and the submission of claims for reimbursement" was not enough for the claims to be

considered false.  880 F.3d at 100.  Here, by contrast, the allegedly false claims are directly connected to the alleged AKS violations.  The referrals from Dr. Hathaway to Oaklawn are exactly what Oaklawn allegedly gave Dr. Hathaway remuneration "to induce," 42 U.S.C. § 1320a-7b(b)(2), and what Dr. Hathaway received the remuneration "in return for," *id.* § 1320a-7b(b)(1).

b.      It is not clear whether the district court understood § 1320a-7b(g) to mean that items or services "result[] from" an AKS violation, and thus that claims seeking reimbursement for those items or services are false under that provision, only if the items and services would not have been provided *but for* the AKS violation.  That would be inconsistent with *Greenfield*, on which the district court relied heavily.  *See Greenfield*, 880 F.3d at 96-98.  It would also be inconsistent with nearly every other decision to address whether the "resulting from" language requires but-for causation.  *See United States ex rel. Fitzer v. Allergan, Inc.*, 2022 WL 3599139, at *10 (D. Md. Aug. 23, 2022); *Kuzma v. Northern Ariz. Healthcare Corp.*, 2022 WL 2159027, at *11 (D. Ariz. June 15, 2022); *United States v. Medtronic, Inc.*, 2021 WL 4168140, at *23-24 (D. Kan. Sept. 14, 2021); *United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, 2021 WL 101193, at *10 (D. Minn. Jan. 12, 2021); *United States v. Teva Pharm. USA, Inc.*, 2019 WL 1245656, at *23 (S.D.N.Y. Feb. 27, 2019); *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, 2018 WL 1996829, at *6 (D. Mass. Apr. 27, 2018); *Kester*, 41 F. Supp. 3d at 331-335.  As discussed above, the district court's analysis appears to have been motivated more by a

- 19 -

misapplication of *Greenfield*'s "temporal proximity" language than by the application of a but-for causal standard.

The Eighth Circuit recently held, contra *Greenfield*, that § 1320a-7b(g)'s "resulting from" language requires proof "that the defendants would not have included particular 'items or services' absent the illegal kickbacks" in order for claims to be considered false under that provision. *United States ex rel. Cairns v. D.S. Medical LLC*, 42 F.4th 828, 835 (8th Cir. 2022).[3] But this Court need not—and thus should not—weigh into that nascent dispute, because relators' allegations are sufficient to establish even the more demanding causal nexus required by the Eighth Circuit. *See United States ex rel. Everest Principals, LLC v. Abbott Labs., Inc.*, 2022 WL 3567063, at *8 (S.D. Cal. Aug. 18, 2022) (declining to resolve dispute over § 1320a-7b(g)'s causation requirement where allegations sufficed under either standard). There is every reason to believe Dr. Hathaway would have stopped referring patients to Oaklawn had Oaklawn not given him remuneration by rescinding its offer to Dr. Martin. He made that threat explicitly. And there is equal reason to believe Oaklawn would have stopped referring patients to Dr. Hathaway and South Michigan if it had established an in-house ophthalmology service line; that is the outcome Dr. Hathaway sought to avoid.

---

[3] Like this appeal, the *Cairns* appeal did not present alternative theories of falsity such as express or implied false certification. The Eighth Circuit accordingly described its ruling as "narrow" and explained that the but-for causation requirement applies only "when a plaintiff seeks to establish falsity or fraud through" § 1320a-7b(g). 42 F.4th at 836.

In any event, to the extent the district court interpreted "resulting from" to require but-for causation, as the Eighth Circuit did, that is incorrect. It is true that the phrase "'[r]esults from' imposes … a requirement of actual causality." *Burrage v. United States*, 571 U.S. 204, 211 (2014). But it does not specify what *standard* of causation applies. The "but-for test" is nothing more than a "default" standard; others exist, and "the availability of alternative causal standards where circumstances warrant is, no less than the but-for test itself as a default, part of the background legal tradition against which Congress has legislated." *Paroline v. United States*, 572 U.S. 434, 458 (2014). Thus, courts properly "read phrases like 'results from' to require but-for causality" only if "there is no textual or contextual indication to the contrary." *Burrage*, 571 U.S. at 212.

As another court observed in rejecting the Eighth Circuit's analysis, *Fitzer*, 2022 WL 3599139, at *10, the Eighth Circuit did not consider the powerful "contextual indication[s]," *Burrage*, 571 U.S. at 212, that § 1320a-7b(g)'s causation standard is not but-for causation. As discussed above, the AKS contains its own nexus requirement: Remuneration can support liability when it is solicited or received "in return for," or offered or paid with the intent "to induce," the provision of items or services or referrals to provide them. 42 U.S.C. § 1320a-7b(b)(1), (2). As its "plain language" makes clear, that standard does not limit AKS liability to situations where the desired outcome of the kickbacks actually materializes, much less where the kickback is the but-for cause of the outcome. *Parikh*, 977 F. Supp. 2d at 665. Such a limitation would be inconsistent with the AKS's animating principle, namely that financial conflicts make it impossible

to trust a provider's judgment whether or not they can be shown to have altered the provider's treatment choices. There is no basis to believe that Congress, having imposed *criminal* liability for AKS violations without requiring but-for causation, meant to require that heightened showing to impose *civil* liability under the FCA for claims rendered false by AKS violations. *See Greenfield*, 880 F.3d at 96; *Fitzer*, 2022 WL 3599139, at *10. Aside from its inconsistency with the basic policy of the AKS, such a standard would significantly complicate the litigation of FCA cases based on AKS violations, requiring extensive efforts to disentangle the motivations of treating physicians (who may not even be among the defendants) for every treatment decision or referral at issue (often numbering in the hundreds or thousands). And it would be inconsistent with the legislative history of § 1320a-7b(g), which makes clear that Congress enacted that provision to "strengthen[] whistleblower actions based on medical care kickbacks." 155 Cong. Rec. S10,853; *see supra* p. 5.

These "contextual" factors, *Burrage*, 571 U.S. at 212, strongly suggest that § 1320a-7b(g) does not impose the but-for standard that the Eighth Circuit adopted. There is a much more natural interpretation of "resulting from" in that provision. Remuneration can support liability under the AKS when it is solicited or received "in return for," or offered or paid with the intent "to induce," referrals or the provision of items or services. 42 U.S.C. § 1320a-7b(b)(1), (2). When those intended results of a kickback actually materialize, as they did here, it makes sense to conclude that they

"result[ed] from" the kickback within the meaning of § 1320a-7b(g), without an additional showing about what would have occurred absent the kickback.

That causal standard somewhat resembles the established doctrine of contributory causation, which can apply when multiple acts contribute to a given outcome even though none is a but-for cause. *See Paroline*, 572 U.S. at 452. In a classic example, "three people independently but simultaneously lean on a car, creating enough combined force to roll it off a cliff"; "[e]ven if each exerted too little force to move the car, and the force exerted by any two was sufficient to the move the car, each individual is a factual cause of the car's destruction." *Id.* Here, it makes sense to consider a medical provider's potential conflicts as a cause of the provider's decisions whether or not the conflicts were necessary or sufficient to cause those decisions.

c.    The district court separately analyzed causation as to claims submitted for services provided to patients referred by Dr. Martin for surgery at Oaklawn, reasoning that those claims could not "be part of an alleged kickback scheme" because Dr. Martin "did not know of the scheme." Opinion and Order, RE108, PageID #1653.

That ruling was equally erroneous, in that it assumed a fact not developed at the pleading stage—namely that Dr. Martin had discretion about where to perform procedures she handled as an employee of South Michigan. If that choice was made by her employer, South Michigan, then the claims would be part of the kickback scheme.

The complaint provides a plausible basis to conclude that it was South Michigan that determined where Dr. Martin would conduct her procedures. It repeatedly

describes "*South Michigan*/Dr. Hathaway" as making referrals to Oaklawn. *E.g.*, RE64, PageID #829 ¶ 92 (emphasis added). And the threats that Dr. Hathaway made to Oaklawn referred to the continuation of referrals for both his surgeries and Dr. Martin's. *See, e.g.*, *id.* PageID #817 ¶ 34 ("Oaklawn receives 100% of *our* Marshall surgical volume" (emphasis added)); *id.* PageID #825 ¶ 69 ("It doesn't make sense for a cash strapped hospital to lay out any money to get [Dr. Martin]'s solo production at the loss of mine when they are getting both of us for free right now" (emphasis omitted)).

     d.    The district court did not address causation as to patients allegedly referred by Oaklawn for treatment at South Michigan. The complaint identifies "claims for procedures referred by South Michigan/Dr. Hathaway to Oaklawn … for which Oaklawn, in fact, received reimbursement from Medicare and/or Medicaid," and "claims for procedures performed by South Michigan/Dr. Hathaway at Oaklawn … and submitted by South Michigan/Dr. Hathaway to Medicare and Medicaid," RE64, PageID #834-839 ¶¶ 119, 123, but does not specifically identify claims submitted by South Michigan or Dr. Hathaway for services provided *not* at Oaklawn but to patients referred by Oaklawn. If relators can identify such claims, however, they would be just as related to the underlying AKS violations as the claims for care provided at Oaklawn. Dr. Hathaway and South Michigan allegedly gave Oaklawn remuneration "to induce" continued referrals to them, and Oaklawn received the remuneration "in return for" those referrals, *id.* § 1320a-7b(b)(1). To the extent the referrals in fact continued, the

- 24 -

items and services provided in the course of the referrals "result[ed] from" the AKS

violations within the meaning of § 1320a-7b(g).

## CONCLUSION

The dismissal of relators' FCA claim should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
    *General*

MARK A. TOTTEN
  *United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH

 */s/ Daniel Winik*
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *daniel.l.winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,499 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Garamond, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik